Approach the podium, I suppose. It's my great pleasure to move the admission of Andrew Nichols, who is a member of the bar in good standing of the highest court of California. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. May I also say that I have personal knowledge of Andrew's credentials, since he has served in my chambers with great distinction as a law clerk these past two years. I am satisfied that he will continue to serve this bar and this profession with distinction. So Mr. Nichols, with great pleasure, I move your admission. And I trust that perhaps Judge Dyke will consider granting the motion. If Judge Proust agrees, yes. Judge Newman, your motion is granted. Mr. Nichols, we welcome you to the bar of the court and thank you for your service here as a law clerk and wish you the best in your future practice. Thank you. Indeed. Thank you. Now, if you will approach the clerk to take the oath. Please raise your right hand. Do you solemnly swear or affirm that you will report yourself as attorney and counsel of this court, rightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals for the Federal Court of Appeals. Thank you, Mr. Nichols. Again, welcome and congratulations. We look forward to seeing you often on that side of the bench, presumably on the appellee's side, but even if that's not the case. Thank you, Judge. Now, to turn to today's calendar, the case this morning is number 2011-1501, CORE against Metropolitan Washington Air Force. Mr. King. Good morning, and may it please the court, your honors. Plan to use my time this morning to address four points. First, that the plaintiffs have standing. Second, that we are in the right court. We're here as opposed to the Fourth Circuit because MLA is a federal instrumentality. Third, that the amount that's being charged for dullest tolls above the cost of the toll road is a tax. And fourth, that that tax is illegal. I think the standing argument, frankly, is not a difficult argument. The district court rejected MLA's argument that we didn't have Article III standing, found that we had a particularized grievance, and that we presented a genuine case or controversy for Article III purposes, but then flipped and concluded that we did not have standing for prudential standing purposes, saying that we had a large number of people, so it was a generalized grievance, and there had been a lot of legislative activity surrounding MLA and the whole issue of the dullest toll road. And therefore, you had the kind of policy concern that prudential standing is triggered by. I think that's clearly wrong. The analysis of Article III standing shows that that's not correct. But also, the first Supreme Court case involving MLA, MLA versus Citizens for the Abatement of Aircraft Annoyance, or MLA versus CAN, that's how I'll be referring to it during the argument, clearly found standing. Maybe in the interest of time, it would be good to move on to your second point, which seems to be difficult. That's fine, Your Honor. And how is this, even if one assumes that the standard of the Amtrak case applies here, it seems to emphasize US government control, and that seems to be absent here, now that the review board is out of the picture as a result of the Supreme Court decision. Your Honor, I don't think that, I would disagree with Your Honor respectfully. I don't think that that emphasizes control. It is certainly true that the constitutional vice in the CAN case was the Board of Review occupied by members of Congress. But in CAN, the court pointed to several elements in addition to the membership of the board. And that was created at the initiative of Congress, the powers that Congress had delineated. But wait, I'm a little confused, because that case did not determine that the entity was a government instrumentality once it was stripped of the review board. Well, it didn't address that question. It didn't address the question of whether it was a government instrumentality. The question was the application of separation of powers concerns. So it didn't talk in terms of federal instrumentality. But if you have the application of the federal constitution, you must have a federal actor. You must have a federal instrumentality. Once the Board of Review is gone, all of the powers of the Board of Review are exercised by EMWA's board of directors. And after all, the thing itself, the actor itself, is EMWA. We're talking here about the people in control of it. In addition, in other cases, you see that federal control is not a key thing, particularly who occupies the board of directors. In the Lebron case, which is the Amtrak case, which is a private entity to which the court applied First Amendment principles, the board there was appointed by federal officials. But there was no removal power. In addition, the court discussed the Regional Reorganization Act cases, which involved Conrail. And there, the Conrail board was all appointed by federal actors. But the court found that Conrail was not acting as a federal instrumentality because the federal government's interest there was as a creditor. And so- But that's the thing. Are you telling us that your objections would be satisfied by a restructuring of the board of directors? I think from the perspective of the federal constitutional problem, which is a separation of powers, that would be resolved. But it wouldn't be. Our fundamental problem is that this entity was created by a contract, an interstate compact entity, that those documents do not give it the power to exact a tax, only tolls and charges and so forth. And the fact that they are exacting something above a user fee is indisputable here because they admit it. The whole purpose of raising the tolls starting in 2005 was to pay for something else. Virginia, under its constitution, cannot delegate a taxing power. That is a legislative power. So merely giving, let's say, the president appointment power over a majority of the board would solve the federal constitutional problem, but it wouldn't solve the threshold question. And indeed, frankly, I think that the narrower ground for ruling on this case is to say, if you agree with us, obviously, that this amounts to a tax, this amount of money. It's a sum certain. It's not a big thing. But we can't reach that if we don't have jurisdiction. No, that's true. And what I'd like to do is I want to go back to your point. So in terms of the elements that the court has looked at to determine whether an entity should have federal constitutional constraints applied to them, as the court at the beginning of Lebron admitted, they've been all over the lot. So there's no rigid formula. And I would say, number one, the membership of the board of directors is not a key element in that. But the point is, here, though, what you have is you have a federal initiative. The MOU was started as a result of an initiative of Congress. It was given powers delineated by the federal government to solve a federal problem. But perhaps even most importantly, its job is to manage federal facilities on federal property. And it's absolutely unique. And I would say, but it is not totally free of federal control, Your Honor, that in both the statute and the lease, which is in the joint appendix starting at page 379, that you see continuing federal oversight of MWA. The Secretary of Transportation has access to the facilities at all time. GAO monitors MWA's contracting practices. They have to report annually to the Secretary. Any labor management impasse is governed by federal law. They must adopt an employment code pursuant to federal law. The rights of MWA's terminated employees are governed by federal law as are annual and sick leave. And finally, GAO conducts annual, or periodic, rather, financial audits. So a lot of that would be true of private contractors with the federal government. But they're not federal instrumentalities where you can sue under the Tucker Act or the Little Tucker Act. No, but this is not a, we know that this is a governmental instrumentality. And that's why this is such a unique and challenging case. Why is the toll road an instrumentality? The access road, perhaps. But why is the toll road an instrumentality? It's not the toll road. It's MWA itself, Your Honor. MWA is the entity that has responsibility for running it now because of a- That's why I asked about the Board of Directors and control, then, of MWA. Right. And the Board of Directors issue really goes, there's two problems here, two legal problems. If we get past the jurisdictional point, one is the imposition of a tax. And if this court simply rules that MWA doesn't have that power under its statute, the case is over. And you don't have to go to the more complicated federal issue. If you believe that they had the authority, then the federal constitutional issue is triggered. And that's a separation of powers issue under the Free Enterprise Fund. And that could- Let's talk about why this is a tax. OK. Your Honor, it is a tax. The proposition of what a tax is versus a user fee is a user fee is exactly what it says. We'll recognize under- Is it a tax because it earns more than it spends on the road? It is a tax because it exacts more money than is needed to fairly approximate the cost of the dullest toll road, as this court has defined a user fee. Let me give you a homey example. If you go to Target to buy a sweatshirt, you buy the sweatshirt, and there's the cost of the sweatshirt, and there's a sales tax on top of that. You're paying for the cost of the shirt, which is the benefit you choose. There is a sales tax that is imposed on top of that, which is set by someone else for benefits that you may never receive and that you don't pick. And we're familiar with that experience all along. So the notion here, Your Honor, is simply, and in all of the cases, both from this court and from the US Supreme Court and the Virginia courts, the concept of a user fee is quite straightforward. You're paying for a present benefit that you're getting now. Anything above that, to raise revenue for something else, is a tax. And that can be imposed by someone. That's not necessarily a bad thing. But our problem here is that EMWA was not given the power to do that, to impose a tax. But is there a question as to what the something else is? If the something else is also access to the airport, that is the extension of the train, is there a difference in your argument as to what the excess funds are used for? No, Your Honor. I mean, the point is, if the funds are used to pay, as this court has said, the fair approximation of the cost of the use of the road. That's the benefit a person is receiving. How about a fair approximation of the cost of getting from here to the airport? Well, what would you be paying for there? I mean, if that's the extension of the metro. Well, that's not the cost. I think, in fairness, the cost has to be the cost of the benefit you are receiving. Let me put this in another example. In the Marshall case, which is the Virginia Supreme Court case that confirmed that Virginia cannot delegate the taxing authority, the authority there was the Northern Virginia Transportation Authority. And it was imposing all sorts of fees and taxes for purposes of improving transportation in the Northern Virginia area. That was the project there. But the court had no problem of pointing out that these are taxes, not fees, because they are raising revenue for good purposes. And we're not here to tell you. You're in a metro line parallel to the access road, right? Pretty much, yes, Your Honor. So somebody could choose to use the metro instead of the access road. The toll road, I mean. And then they can choose to pay for the cost of metro. But someone who's using the road is using the road. And I think the problem is that, as you can see, if you So the government's argument is that this will help with congestion on the toll road, because people have the option of taking the metro. So it benefits the people who are using the toll road. Well, the question of voluntariness, as I was just saying. No, no, but it's not a question of voluntariness. It's a question of it helps, it benefits the users of the toll road. Because some people will elect to use the metro and will reduce congestion on the toll road. It very well may. But, Your Honor, I think the cases on what is a tax versus what is a user fee are very clear. It is a benefit, just like I get the sweatshirt when I buy it. It is not some vague thing that I'm going to get a benefit years from now, or someone else is going to benefit, and that's going to generally help me. And I think the courts have uniformly said that, because anything else is unworkable. As our conversation illustrates here, you could tease out a project and talk about the benefits. We do benefit from taxation. I mean, there's no doubt about it. The government's benefits help us. But what we pay to get those benefits is a tax. And so I think the questions that you're asking really move away from the strict line that the courts have drawn about this very practical understanding of the user fee and make an unworkable standard. And the point here is this is really fundamental stuff, because as the Virginia case law and Virginia Constitution provides, and our Constitution, this goes to the accountability of people who are imposing a tax. We have now people insulated from that, and this is a highly regressive tax. Now, legislators who have to stand for election might want to make that choice, but not unelected people. And that's why the law prevents it. But I think the jurisdictional point here is simply, this was created as an independent entity, as a governmental entity. And what is it? It's got to be something. It can't just float out there in ether. And when you look at its unique purpose, there's no other interstate compact like this. And I can't imagine why there would be. Interstate compacts focus on regional concerns of states. Normally, a federal government would set up a federal agency to do this. But in order to finance the expansions of the airports, as the Kahn opinion explains, they initiated the creation of this interstate compact entity. So in one sense, you could say it's even not a genuine interstate compact entity. But the point is, all it is doing is running federal facilities. It is a federal instrumentality. It can only be seen that way. I mean, if it's not, what is it? It's not private. It's not part of the state government. And it cannot be an independent governmental entity. I think when you look at this bizarre entity, the way this is created, you have to come out with a federal position. And unless you want to take more questions, I've been too much. We'll save your vital time. This is a same time. OK. Thank you. Here from the Metropolitan Washington Airports Authority, Mr. Raphael. May it please the court, Stuart Raphael for MWA and with me as the Vice President and General Counsel of the Airports Authority, Phil Sunderland. There are four threshold issues here that dispose of the appeal. Number one, there's no Tucker Act jurisdiction because MWA is not a federal instrumentality. Why don't you answer your friend's question as to what it is if it's not a federal entity? It's a hybrid compact entity. That's what Professor Triban's Constitutional Law Treatise describes as a compact entity. It's formed by the states. It's got to be approved by Congress. So it's independent of the institutions that form it. It's an independent hybrid entity under our Constitution. So in all that theory, there's no forum for anyone with a concern? Is that what you're telling us? Not at all, Your Honor. The compact provides original jurisdiction in the circuit courts of the Commonwealth of Virginia for claims by or against MWA. Under the federal lease, if there's a claim arising under the lease, the lease can be enforced in federal court. And the Transfer Act that Mr. Sinkar described provides federal jurisdiction for that. Well, what about the claim that they're imposing a tax rather than a fee, and that their authority under the congressional legislation is only to impose fees and not taxes? Who's supposed to determine that question? Well, if they're suing MWA, a court with jurisdiction over MWA would determine that question. We don't admit that this is a tax. It's undisputed in the record. Well, of course, I'm not suggesting that. I'm asking you, they say it's a tax. Which court is supposed to determine that, and under what authority? Well, they sued under federal question jurisdiction in the Eastern District of Virginia. The court had federal question jurisdiction. It decided that issue. We expected the appeal, frankly, to go to the Court of Appeals for the Fourth Circuit. They came here instead. So if they were going to the Fourth Circuit, that would be the right place to go. That would have been the right place to go. And if that's the case, why shouldn't we transfer it to the Fourth Circuit? Well, for really two reasons. Number one, they've said on appeal, they've limited their case on appeal to a Tucker Act claim against MWA under the Due Process Clause and under the Separation of Powers Doctrine. Under your decisions in LeBlanc and Norman, there is no federal jurisdiction in this court for a little Tucker Act claim, a Tucker Act claim, based on those two provisions. Why not a monetary claim against the government that a Tucker Act is very broad? The Tucker Act provides for illegal exaction claims under the Due Process Clause. But as the court said in Norman, it has to be based on a statute that contemplates the return of money. And there isn't any such statute here. So that's why we say that they didn't have a money mandating claim. If it's an illegal exaction, it's not necessarily a statute. That's what the court said in Norman that there needs to be. And it went on. It wasn't dictum, because the court went on to say that the statute in that case, in the Appropriations Act, did not imply a return of money. So I think the court. I don't think that's the only authority controlling the right to recover an illegal exaction levied by the government. I believe that's the most recent authority, Your Honor. And as Your Honor decided in the Ariel Linnitz case, there you had a statute that was where Congress said, the federal government has to pick up the cost of housing people who are seeking asylum. And the airline said, the statute provides that Congress picks up the tab, not us. And you said that they had an illegal exaction claim. But that was based on the statute. If there is a statute, then we deal with the statute. But you know our rule that if there is an apparent conflict or ambiguity between decisions, it's the earlier that prevails, not the later. Well, Your Honor, I don't believe there is a conflict between Ariel Linnitz, which was cited in Norman. And as I said, Ariel Linnitz was based on the decision on a statute. I think Your Honor's opinion refers to that in the course of the case. My first two threshold issues were that M-1 is not a federal instrumentality. But wait, come back to this question of transfer for a moment. You say they're limiting their claims on appeal to a little pucker act claim? Yes, Your Honor. Where do they say that? They say that at the reply brief on page one, quote, our illegal exaction contention long recognized as granted in the due process clause. And then at page six, they refer to our legal exaction claim clause squarely. There's no question that they're asserting that claim. But where do they say they're limiting themselves to that? Well, that's all they appealed, Your Honor, that they only have two claims on appeal. They had a host of claims in the trial court. They started off with a no taxation without representation claim. We moved to dismiss it. They came up with about a dozen other claims, including lack of delegation, all these other things. Judge Trenga systematically dismissed all of them. The two claims they've picked to pursue on appeal are the due process claim, grounded only in the due process clause, and the separation of powers claim. There is no jurisdiction under the Tucker Act for those claims anywhere. So that's why the court should dismiss them rather than transfer them to the Fourth Circuit. So let's assume for your remaining time that we think maybe there's jurisdiction after all. And let's get to the substantive question of the tax. Well, the plaintiffs have not come forward with a single case where a toll was invalidated as a tax. It's undisputed in this case that the toll revenues that are raised from the Dulles toll road go solely to pay for, number one, and in this order, operation and maintenance of the toll road, and then any surplus goes for the construction of the Metrorail to Dulles Airport. It was undisputed in the record that building this Metrorail extension will reduce traffic for everybody through that corridor, including the users of the toll road. And under all of the cases that have come out, looking at whether something is a user-free or a tax, that is adequate to show it's not a tax, because there's a tight nexus between the source of the revenues and what they're spent on. The users of this toll road will benefit from their tolls because the traffic will go down in the future. And that's undisputed in the record, too, that's at page 265 of the joint appendix, the environmental findings by the Federal Department of Transportation. The plaintiffs cite primarily a Virginia law case, Marshall, for why they say this is a tax. We distinguish that in our papers. The reason in Marshall you had seven different fees, which even the defendant admitted were taxes that were used to raise transportation revenues generally. There was no nexus between the things the fees were charged for, the services provided, and what the monies were spent on. In this case, there's a tight nexus. And that's why this case does not involve a tax. I would like, if the court doesn't have further questions on that, to go back to what I think are the dispositive threshold issues. NY is clearly not a federal instrumentality. It was not created by Congress. It was created by Virginia and the District of Columbia. The key findings are in 49 U.S.C. section 49106. This is the Transfer Act. After MWOA was created, the federal government allowed the airports to be transferred under a lease, 50-year lease to MWOA. And these are the findings that Congress made. Finding number three, the U.S. government has a continuing but limited interest in the operation of those federal airports. Finding four, the operation of the airports could best be done by an independent local authority. Finding seven, in recognition of a perceived limited need for a federal role, the airport should be transferred to the local or state level. And finding 10, the federal interest in these airports can be provided through a lease mechanism. So at the same time that that was enacted, there was a Board of Review, which was composed of members of Congress, which controlled this. And at that point, wasn't your client a federal instrumentality? No, Your Honor. The original contact did not have a Board of Review. Congress, as part of the, you're right, in 1986, as part of the Transfer Act, insisted that there be a Board of Review, which created a congressional veto over anything MWOA did. So if the congressional veto existed, it would be a federal instrumentality, wouldn't it? The Board of Review was a federal instrumentality. And that's what the court thinks. The whole thing. No, I don't think, I don't, no, is the short answer. Because MWOA is an interstate contact entity. The Board of Review was comprised of members of Congress who could veto its decisions. And the court in MWOA versus Kahn said that was a federal instrumentality for separation of powers purposes. Even though Congress said, these aren't congressmen in their official capacity, they're in their personal capacity, the court didn't buy it. They were still, it was still a congressional veto. And it failed for bicameralism and presentment clause purposes. What the court was talking about, and I think Mr. Sinkar admitted this in Kahn, was not MWOA or the MWOA Board as a federal instrumentality, but that Board of Review, which was struck down. And it's been excised from the statute. Well, I understand it's been excised. But my question was, if it wasn't excised, it would be a federal instrumentality. Well, I don't believe that's, oh, the Board of Review, sure. But that's gone. No, no, no, the whole, the entity, the Board of Review control. It can't be. Because it's not under federal control. There are only three of 13 members who sit on the board. I beg your pardon? Under the original Board of Review, the Board of Review controlled the entity. It had veto authority. Yes, and the Board of Review is gone. So what's left? A 13-member board, five people from Virginia, three from the district, right? This court, in footnote three of Slatter, in the opinion by Judge Newman, said that where Congress wants to say that an entity doesn't create Tucker Act liability for the United States, it knows how to do that. They didn't say that. They didn't disclaim Tucker Act liability. Footnote three of Slatter, Your Honor, reads, the Tucker Act is not available. I'm saying in this case, in this case, there is no disclaimer of Tucker Act liability. Congress did, in this case. They're still saying that by putting the representatives of the states on this Board of Review, we abdicate federal authority. No, Your Honor, the Board of Review doesn't exist anymore. It's just the Board of MLAW, which is 13 members. Exactly. They didn't say they were abdicating their authority. They were giving a few more people a voice in these federal instrumentalities as the airports that just happen to reside in Virginia. Two points, Your Honor. There are only three members federal appointees to the MLAW Board. The rest are state appointees. Number two, what the court said in footnote three of Slattery was to offer examples of how Congress can do things to prevent an entity from subjecting the federal government to Tucker Act liability. The second case that was cited in that footnote was Green versus the United States from the Court of Claims in 1982, where the court said that because Congress, in creating Amtrak, said Amtrak, quote, will not be an agency or establishment of the United States government, unquote, that was dispositive for Tucker Act purposes. And that's why I asked whether there was some kind of comparable statement in this case. Yes. And there is. And you'll find it, Your Honor, in 49 U.S.C., section 49106A2, where Congress said MLAW is, quote, independent of dot, dot, dot, it lists Virginia, local governments, the district, but it says independent of the United States government. And Congress said four times in the Transfer Act that MLAW was independent. That is as clear a disclaimer as you had in Green, which is control and precedent in this court. So when Congress says the entity is not part of the federal government, it's dispositive, as LeBron said, assuredly dispositive for statutory purposes. That doesn't necessarily mean that an entity that Congress creates and can control as a practical matter is exempt from constitutional purposes. That's the teaching of LeBron. So Amtrak. So in their theory, they're asserting a constitutional point here. Yes, that's what they're saying. They're conflating LeBron's discussion about the distinction between statutory and constitutional purposes and the difference between a Tucker Act jurisdictional analysis, on the one hand, and what the underlying constitutional claim is on the other. Green, again, is the perfect example. Green held Amtrak did not subject the U.S. to Tucker Act liability. Amtrak is subject to First Amendment scrutiny, according to LeBron. Why? Because six of its eight outside directors were appointed by the president, and the court seems to be very difficult to view statements in this legislation as implied repeal of the Tucker Act. If they're asserting a constitutional claim, how can it be that there's not a Tucker Act jurisdiction, a constitutional claim, and they're a federal instrumentality? Well, they've got two problems. It's not a federal instrumentality. All the cases say it. I understand, but what I'm taking issue with is your suggestion that these statutory statements are conclusive on that. The teaching of Green is that Congress doesn't have to say the entity is immune from the Tucker Act. Congress just has to say the entity is not part of the federal government. That's what happened in Green, and you have the same situation here. Secondly, it's not the United States. It's not controlled by the United States. All of the cases to date involving MWA that touch on what it is say it's created by the states, not by Congress. The other elephant in the room here is they didn't sue the United States. I'm from a firm, privately. There are plenty of cases where people have named the wrong party, for example, in the Court of Federal Claims into the Tucker Act, and it's treated as a suit against the United States. And the US usually substitute in it. I couldn't find a single case, Your Honor, where Maybe the US should be substituted in. What's a little late now. There's been a final judgment in the trial court. Well, it's up on appeal. We've got to order that the US be substituted. Well, I can't speak for the United States. I know that 28 U.S.C. Section 516 provides that only the United States can speak for an agency of the United States. There are two ways that Slatter has been a good example. Two ways they could have gone. They could have sued the FDIC separately. Instead, they sued the United States under the Tucker Act. And Your Honor's opinion said there's current liability or jurisdiction under the Tucker Act for a claim against the United States. They didn't have to sue the FDIC. Here, they want to mix it up. They sued EMWA, and we thought they were suing EMWA in district court. But now they want to say it's the United States. It's not. It's a totally different claim. They did not sue the United States. Let me touch, in the time I have left, on why we think that the court should dismiss this case. Let me make sure. So if we would agree with your premises, the case should be transferred to the Fourth Circuit? Well, that's what I would, thank you, no. The court should dismiss it for two big reasons. Number one, they've limited their claim. Well, if they're in the wrong court, it should be transferred. Well, in the interest of justice, you have the discretion to transfer it, yes. But here's why I would suggest that you dismiss. Number one, they've said on appeal their claims are due process and separation of powers under the Tucker Act. There is no such creature. What case sets the standard for determining whether we dismiss or transfer? Well, I believe I can't cite you a case. It's 28 U.S.C. Section 1361. Well, I know what the section is. It says interest of justice, which isn't exactly clear. The case that we rely on. You can't cite a case that supports dismissal as opposed to dismissal. Well, the case I would rely on, Your Honor. You're not saying it shouldn't be transferred because they would lose in the Fourth Circuit, which would require us to review the merits of their argument to start with. And if we have no jurisdiction, you tell us we can't do that. May I answer? Please. The authority is Comrida v. Green, footnote 8 of the U.S. Supreme Court decision 2011. The court, an appellate court, is not limited to one threshold issue here. The court, if you don't agree with me that you should dismiss because they've limited themselves to a Tucker Act claim that's not viable, then you should dismiss because under the Fourth Circuit's decision in Park Ridge, they don't have prudential standing. That's a threshold issue, which I think you can decide in the context of dismissing it. Not a very good argument. Well, you have the discretion to transfer, but we think that this case has been a cloud on this multibillion dollar project for long enough, and you should use your discretion to not transfer, but to dismiss based on the threshold issues. Thank you, Your Honor. Thank you, Mr. Raphael. Ms. Sincar, let's say we ran over. Let's make it four minutes. Thank you, Your Honor. Appreciate it. Is Mr. Raphael correct that you're only asserting a Tucker Act claim here? No, we are here because if you have a little Tucker Act claim in district court, in part, the jurisdictional statutes require you to do it. I understand that, but let's assume that we reject your contention that there's jurisdiction on the little Tucker Act. We hold this is not a federal instrumentality, just hypothetically. Where do we go from there? What is left of this case to transfer to the Fourth Circuit? I think there are two things. First of all, under the many cases construing, the dire cases of construing interstate compacts that have been approved by Congress, they become federal law when Congress approves them, giving federal courts jurisdiction over their construction. Our argument is that under the terms of this compact, this contract, they don't have the power they're exercising. Because this is now federal law, it is a federal question that can be adjudicated in the Fourth Circuit. Second of all, even though Judge Trenga said we waived our 1983 claim, in fact, we didn't. We pled the case. Because of the confusing posture of this entity, we pled it both as if it were a state actor and a federal actor. And he pressed both of us during the argument. And I said, my view was that probably they were more of a federal instrumentality than not. And that's where he got that. We didn't. I wasn't intending to waive the 1983 claim in case someone disagreed with me. But I do think that the courts have said here, labels don't matter. How is this entity functioning? We have the weird labels, the unusual labels here of this being a governmental body exercising governmental power that's supposed to be independent of every governmental entity. And so I just want to be clear. I guess I'm not crystal clear on your response to Judge Dyke's argument. OK, all right. Please. On the sole question, hypothetical question, if we conclude that they're not a federal instrumentality, so there's no little Tucker Act jurisdiction, with respect to the issues you appealed to us, that you have preserved our appeal, which of those issues would there be jurisdiction over in the Fourth Circuit in the absence of Tucker, if there's no Tucker Act claim? There would be the issue that they're an entity that doesn't have the power to exact taxes from us under the terms of the compact. Because now that is federal law, given that Congress has approved it, and the federal courts, under well-established body of precedent under interstate compact law, have jurisdiction over that. Where do you brief that on the appeal? Where would we brief it? Where did you brief it? It really hasn't come up. That's the problem. I mean, you didn't brief it. I'm sorry. You didn't brief it. You've got a problem, don't you? Well, the transfer, the motion to dismiss and transfer, we initially briefed. And as I stand here, I will tell you I don't recall whether we briefed that particular issue. But I think that the novelty of this entity, when you talk about the interests of justice, we're all going through new territory here. So it's not like we cavalierly abandoned any kind of jurisdictional component. The proposition that this is federal law is established, that there was no argument over that. We didn't have any need to brief it. And so I would say that under the normal practice of transferring a decision, a case like this, if you don't feel the Tucker Act applies, that clearly the interests of justice must apply here in such a novel arena. But don't you think that you would be limited to what you appealed here? You've made the decision here which questions to appeal that were before the district court and which not to. Do you think that your decision with respect to what you wanted to appeal, you have the ability to revisit that if we transfer this case to the fourth circuit? Not at all, not at all, Your Honor. I do think that we are limited to what we wanted to appeal, which is the improper tax. Virginia couldn't have given the power. And then ultimately, if you rule that this is not a federal instrumentality, obviously the federal constitution may not apply. But the question is, where did you brief the claims that don't depend on the little Tucker Act? You didn't, right? Well, we didn't. There was no need to. There was no occasion to do that, frankly. I mean, we were briefing the question of whether the court had jurisdiction because this was a federally approved compact really was not an issue in the district court. And you can only brief so many things with page limits and so forth. But that is the law. I mean, I tell you that honestly, and obviously the court can check. But that is certainly the law. But the problem is, of course, is that under the jurisdictional statute, if your claim is based in part on the Tucker Act, you must come to this court. And so that's why we're here. If I could just say, I realize my time is up, but I could say one more thing about this whole benefit question. The money that is raised above the toll can be spent on anything in the Dulles Corridor. The Dulles Corridor, very much like Northern Virginia was in the Marshall case, stretches from the East Falls Church metro stop all the way out past Dulles Airport. It is a huge area, and it can be spent on anything. It doesn't have to be spent on metro. It can be spent on building a strip mall to service people going to the airport. Who knows? And that illustrates the taxing quality of it. That might be a good thing. It might be a benefit. But it is not the service that a toll road driver is getting and paying for. OK. Thank you very much. Thank you, Your Honor. Thank you. Thank you, Your Honor. Thank you for taking this position.